1

2

3

4                                    UNITED STATES DISTRICT COURT

5                                  NORTHERN DISTRICT OF CALIFORNIA

6

7    TOPPAN PHOTOMASKS, INC.,                          Case No.  13-cv-03323-MMC (JCS)

              Plaintiff,

8

        v.                                             **ORDER GRANTING IN PART AND
9                                                      DENYING IN PART PLAINTIFF'S
     KEUN TAEK PARK,                                   MOTION FOR SANCTIONS**
10
              Defendant.                               Re: Dkt. Nos. 57, 72
11

12

13   **I.      INTRODUCTION**

14          In this trade secret and breach of contract suit, Plaintiff Toppan Photomasks, Inc. ("TPI")

15   moves for sanctions in the form of adverse inferences and monetary sanctions against Defendant

16   Keun Taek Park ("Park") for Park's alleged spoliation of evidence. *See* Pl.'s Mot. for Sanctions

17   ("Mot."). Judge Maxine M. Chesney referred the Motion to a magistrate judge and ordered the

18   parties to file a joint letter explaining the dispute. *See* Dkt. No. 61. The parties properly filed a

19   joint letter on January 28, 2014. *See* Dkt. No. 72 ("J. Letter").[1] The Court finds that this Motion

20   and Joint Letter are suitable for decision without oral argument. *See* Civ. L.R. 7-1(b). For the

21   reasons set out below, the Court GRANTS IN PART AND DENIES IN PART TPI's Motion.

22   **II.     BACKGROUND**

23          The following is a summary of the facts that are relevant to the instant motion. Unless

24   _____

25   [1] TPI incorrectly asserts that Park was obligated to respond to the Motion on January 3, 2014. *See*
     J. Letter at 2–3. Judge Chesney's December 23, 2013 referral order clearly required the parties to
26   file a joint letter, and it further explained that "[t]he Magistrate Judge *may* issue a ruling, *order
     more formal briefing*, or set a telephone conference or a hearing." *See* Dkt. No. 61 at 1 (emphasis
27   added). TPI's citation to Civil Local Rule 7-7(d) is inapposite because the hearing on the instant
     Motion was vacated, not continued. *See id.* at 2; J. Letter at 4.
28

United States District Court
Northern District of California

1    otherwise noted, these are the facts as alleged by TPI.

2          TPI is a company specializing in the development and manufacture of photomasks. Compl.

3    ¶ 7. A typical photomask consists of glass or quartz substrate coated with one or more thin films,

4    into which precise geometries are drawn. *Id.* Semiconductor manufacturers use photolithography

5    (a process that uses light) and chemical treatments to transfer the geometric pattern from the

6    photomask to a wafer, *i.e.*, a thin slice of semiconductor material that is used to make integrated

7    circuits and other microdevices.  *Id.* ¶ 8. TPI uses a plasma dry etching process to create its

8    photomasks. *Id.* ¶ 9. The precise composition and control settings of the plasma used to create the

9    photomasks are highly confidential and proprietary data that have significant economic value. *Id.*

10   TPI's "plasma creation and dry etching processes" are trade secrets. *Id.* ¶ 11.

11          TPI hired Park as a Senior Process Engineer in September 1999, and he served in this

12   position until November 30, 2012 when he was terminated pursuant to a voluntary layoff plan. *Id.*

13   ¶¶ 13, 16. As a Senior Process Engineer, Park "was responsible for developing and modifying

14   processing techniques and methods applied in the manufacture, fabrication and evaluation of

15   photomasks." *Id.* ¶ 14. Park worked in TPI's secure factory in Round Rock, Texas. *Id.* ¶ 15. Upon

16   his initial hiring and termination, Park signed agreements to maintain the confidentiality of TPI

17   information by not using it or sharing it with anyone else. *See id.* ¶¶ 13, 16, 17. He signed a

18   "checklist" on his last day that specifically acknowledged his obligation not to "remove from the

19   premises" any confidential TPI information. *Id.* ¶ 17. TPI asserts that during his employment with

20   TPI, Park did not work from home, nor was he ever authorized to. *See* Decl. of Danielle Ochs in

21   Supp. of Pl.'s Mot. for Sanctions ("Ochs Decl."), Ex. A ¶ 10 (Decl. of Franklin Kalk in Supp. of

22   Mot. for TRO) ("Kalk Decl."), Ex. D ¶ 5 (Decl. of Lisa Lopez in Supp. of Mot. for TRO) ("Lopez

23   Decl.").

24          In May 2013, TPI learned that Park had taken a position with Compugraphics USA, Inc.

25   ("Compugraphics"), an industry competitor. Compl. ¶ 19. On May 21, 2013, in a telephone

26   conversation with TPI, Park confirmed that he had accepted employment with Compugraphics.

27   *See* Lopez Decl. ¶ 9. In a letter dated May 23, 2013, TPI advised Park that it intended to

28   discontinue the severance payments that he had been receiving pursuant to the voluntary layoff

United States District Court
Northern District of California

2

United States District Court
Northern District of California

1    plan, and it reminded Park of his post-employment confidentiality obligations. *Id.* Ex. F at 2

2    ("May 23 Letter"). TPI also demanded that Park "cease and desist any and all activities that [he

3    was] currently engaged in that contravene [his] obligations" under his voluntary layoff plan

4    agreements. *See id.* at 1.

5         On June 3, 2013, TPI contacted Compugraphics about Park. Compl. ¶ 20. In a phone

6    conversation with TPI, Compugraphics President Mark Crownover ("Crownover") confirmed that

7    Park was working for Compugraphics as a staff engineer and was responsible for transferring

8    Compugraphics' ten-year old dry etch process from its facility in Scotland to its facility in

9    Fremont, California, and that Park would also be responsible for managing the dry etch module in

10   Fremont. *Id.* Crownover assured TPI that Park would not be using TPI recipes or customer

11   knowledge. *Id.* That same day, Crownover followed up on the phone call with a letter to TPI

12   providing similar assurances. *Id.* ¶ 21.

13        After this correspondence with Crownover, TPI conducted a search of Park's e-mail

14   activity prior to his termination from TPI. *Id.* ¶ 22. In or around July 2013, TPI discovered that on

15   November 29, 2012, one day prior to Park's last day at TPI, Park sent two files from his TPI e-

16   mail address to his personal e-mail address. *Id.* ¶ 22; Ochs Decl. Ex. B ¶ 5 (Decl. of John Cochran

17   in Supp. of Mot. for TRO) ("Cochran Decl."). The e-mail subject line was "files" and the body of

18   the e-mail did not contain a message. Cochran Decl. ¶ 5. The attached files were: (1) an Excel file

19   entitled "work daily tracking.xlxs" and (2) "work_daily.doc." *Id.* TPI asserts that these files

20   contain highly confidential trade secrets worth millions of dollars. Compl. ¶ 22. Park asserts that

21   he had e-mailed these files to himself in order to prepare for a training he was going to conduct for

22   remaining TPI engineers on his last day. *See* J. Letter at 5. *See also* Ochs Decl. Ex. E at 82:8–

23   83:20 ("Park Dep.") (testifying that in November 2012, he took TPI files home on a USB device

24   because he needed to "work at weekend . . . [and] to provide the training"). Park further asserts

25   that a trainee engineer "recollects being trained by Mr. Park on the contents of those same

26   documents." *See* J. Letter at 5. TPI does not confirm or deny the existence of such a training.

27        On July 16, 2013, TPI's counsel, Danielle Ochs ("Ochs"), attempted to contact Park by his

28   last known mobile telephone number to inform him that TPI would be filing a suit against him the

3

1   next day, and left him a voicemail. *See* Ochs Decl. ¶ 4. On July 17, 2013, TPI filed the instant suit,

2   and Ochs e-mailed Park to notify him of the same. *See id.* ¶ 5. Ochs' e-mail included a specific

3   instruction to preserve evidence:

> [P]lease take notice that you are required to preserve all evidence in
> this case. Your deletion or destruction of any information, whether a
> device, or in hard copy or electronic form, will constitute spoliation
> of evidence and will result in further claims against you.

7   Ochs Decl. Ex. F. The Complaint was attached to the e-mail. *See id.*

8          On July 18, 2013, TPI filed a motion for a temporary restraining order ("TRO"). *See* Dkt.

9   No. 6. That same day, Judge Chesney presided over a telephonic hearing regarding that motion;

10  Park was still not represented by counsel at that time. *See* Ochs Decl. Ex. G ("TRO Hr'g Tr."). At

11  the hearing, Judge Chesney indicated that she would grant the motion for the TRO in part, which

12  was done the next day. *See id.*; Ochs Decl. Ex. H ("TRO"). Also during the hearing, Judge

13  Chesney ordered Park to preserve evidence:

> Sir, if you do have anything that's important to the case, now that
> you know what the case is about, don't throw it away or try to get
> rid of it, or you might be exposed to some other type of complaint.

16  *Id.* at 17:18–21. Park testified at his deposition on August 15, 2013 that he understood Judge

17  Chesney's statements at the hearing as an order to refrain from deleting files from his Dell

18  Inspiron laptop. *See* Park Dep. at 52:17–53:2. The TRO itself enjoined Park from "possessing,

19  using or disclosing any of TPI's confidential information" and required him to "account (through

20  expedited discovery) for and return to TPI any and all of TPI's property . . . ." TRO ¶¶ 2(b), 2(c).

21         On August 20, 2013, Park released twelve electronic devices to TPI's forensics inspector,

22  Advanced Discovery.[2] Ochs Decl. ¶ 13. After inspecting Park's devices, Advanced Discovery

23  informed the parties that it had identified thousands of deleted files, some of which were

24

_____

25  [2] Advanced Discovery inspected twelve devices: (1) Dell Inspiron laptop, (2) HP Pavillion laptop,
    (3) Lenovo laptop, (4) Amazon Kindle Fire, (5) Seagate external hard drive, (6) SanDisk USB, (7)
26  Office Depot USB, (8) Toshiba SD card, (9) TomTom SD card, (10) Multimedia SD card, (11)
    SanDisk Memory Stick, and (12) Sony Cyber Shot digital camera. Decl. of Aaron Magley in
27  Supp. of Mot. ¶ 6. Park appears to have used these devices for both personal and work purposes.
28  *See, e.g.*, Park Dep. at 39:3–11.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    overwritten, meaning that they could only be recovered, if at all, through a process known as

2    "carving." *Id.*; Decl. of Aaron Magley in Supp. of Mot. ¶¶ 5–7, 9 ("Magley Decl."). TPI has

3    identified several deleted or overwritten files that have "strong indicators that they contain TPI

4    data." *See* Mot. at 8–9 (citing Magley Decl. ¶ 9); Supplemental Decl. of Franklin Kalk in Supp. of

5    Mot. ¶¶ 3, 14 ("Kalk Suppl. Decl."). TPI seeks monetary sanctions to compensate it for the costs

6    of researching these devices; specifically, it seeks approximately $20,000 in fees for Advanced

7    Discovery, and $14,000 in attorney's fees in connection with this Motion.[3] *See* Ochs Decl. ¶ 16,

8    Ex. O.

9         Park argues that TPI is distorting the facts. He argues that there is no evidence that he

10   actually used or disclosed any TPI information. *See* J. Letter at 5. Park asserts that he "had

11   absolutely no need or desire for TPI documents," and that he "simply . . . delete[d] those that were

12   left on his computers from years of working from home." *See id.* He asserts that he stopped

13   deleting TPI files as soon as he retained counsel in July who helped him understand his

14   obligations, and that he deleted no TPI files in August. *See id.* Specifically, he testified at his

15   deposition that he had deleted TPI files from his Dell laptop from January to July 2013, but he did

16   not recall whether he deleted any files in August 2013. Park Dep. at 48:17–53:22. Park points out

17   that the forensic reports show that Park "sporadically deleted TPI-related documents at various

18   intervals over the years." *See* J. Letter at 6; Park Dep. at 52:11–13 (testifying that deletion of files

19   was a "continuous activity" and "I didn't delete whole file in just one day. I just look through it,

20   and as I find it, I just delete it.").

21        Additionally, Park asserts that he did not overwrite any of the deleted files manually;

22   rather, overwriting occurs automatically when devices need more memory as a result of regular

23   use. *See id.* TPI does not contest this characterization of overwriting. Park also asserts that

24   "carving" to recover overwritten files is less expensive and has a higher likelihood of success than

25   represented by TPI. *See id.* Finally, Park asserts that the "vast majority" of files deleted and

26

27   _____

   [3] The Advanced Discovery invoices show that so far, the forensic investigation costs have been
   split with Park's counsel. *See* Ochs Decl. Ex. O. The $20,000 figure represents the costs incurred
28   by TPI only. *See id.* TPI has not submitted documentation regarding attorney's fees.

1    overwritten during the period from May to July 2013 were unrelated to TPI and irrelevant to the

2    case, including systems and application files, temporary files, temporary internet and media files,

3    and other computer-created files. *See id.*

4    **III.     LEGAL STANDARD**

5           Courts are vested with inherent powers arising out of "'the control necessarily vested in

6    courts to manage their own affairs so as to achieve the orderly and expeditious disposition of

7    cases.'" *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir.

8    1992) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)). The Ninth Circuit has

9    specifically recognized trial courts' "inherent discretionary power to make appropriate evidentiary

10   rulings in response to the destruction or spoliation of relevant evidence." *Glover v. BIC Corp.*, 6

11   F.3d 1318, 1329 (9th Cir. 1993). These inherent powers include the ability to levy appropriate

12   sanctions against a party who prejudices its opponent through the spoliation of evidence. *Leon v.*

13   *IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006); *Apple Inc. v. Samsung Electronics Co., Ltd.*,

14   881 F. Supp. 2d 1132, 1135 (N.D. Cal. 2012) (citing *Glover*, 6 F.3d at 1329).

15          A trial court's discretion regarding the form of a spoliation sanction is broad, and sanctions

16   can range from the minor, such as the awarding of attorneys' fees, to the more serious, such as

17   dismissal of claims or instructing the jury that it may draw an adverse inference. *Apple*, 881 F.

18   Supp. 2d at 1136 (citing *Leon*, 464 F.3d at 958, 961; *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376,

19   386–87 (9th Cir. 2010)) (some citations omitted). The determination of an appropriate sanction "is

20   assessed on a case-by-case basis." *Io Grp. Inc. v. GLBT Ltd.*, C-10-1282 MMC DMR, 2011 WL

21   4974337, at *3 (N.D. Cal. Oct. 19, 2011) (quoting *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d

22   423, 436 (2d Cir. 2001)) (internal citations omitted).

23          To determine whether spoliation occurred, the majority of courts use some variation of the

24   three-part test set forth by Judge Scheindlin. *Apple*, 881 F. Supp. 2d at 1138 (citing *Zubulake v.*

25   *UBS Warburg LLC*, 220 F.R.D. 212, 215 (S.D.N.Y. 2003) ("*Zubulake IV*")). That test has three

26   elements: "(1) that the party having control over the evidence had an obligation to preserve it at

27   the time it was destroyed; (2) that the records were destroyed with a 'culpable state of mind;' and

28   (3) that the evidence was 'relevant' to the party's claim or defense such that a reasonable trier of

United States District Court
Northern District of California

1    fact could find that it would support that claim or defense." *Zubulake IV*, 220 F.R.D. at 220.

2          If spoliation is found, then courts generally consider three factors to determine whether and

3    what type of sanctions to issue: "(1) the degree of fault of the party who altered or destroyed the

4    evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a

5    lesser sanction that will avoid substantial unfairness to the opposing party." *Nursing Home*

6    *Pension Fund v. Oracle Corp.*, 254 F.R.D. 559, 563 (N.D. Cal. 2008) (quoting *Schmid v.*

7    *Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994)) (courts should choose "the least

8    onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered

9    by the victim"). After considering these factors, a court may decide to defer or decline to grant

10   sanctions, despite a finding of spoliation. *See, e.g.*, *Hamilton v. Signature Flight Support Corp.*, C

11   05-0490 CW (MEJ), 2005 WL 3481423, at *8 (N.D. Cal. Dec. 20, 2005) (finding spoliation but

12   declining to impose adverse inference sanctions because of lack of prejudice).

13   **IV.    ANALYSIS**

14        **A.    Spoliation**

15        For the reasons explained below, the Court finds that TPI has made a limited showing of

16   spoliation. Although it is not entirely clear how many of the deleted or overwritten files meet the

17   test for spoliation, the Court determines that something less than 1,650 files have been spoliated.

18        **1.    Park's duty to preserve evidence**

19        Litigants have a duty to preserve "what [they know], or should know, is relevant in the

20   action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably

21   likely to be requested during discovery and/or is the subject of a pending discovery request." *Io*

22   *Grp.*, 2011 WL 4974337, at *5 (quoting *Zubulake IV*, 220 F.R.D. at 217). As to when the duty

23   arises, it "arises not only during litigation but also extends to that period before the litigation when

24   a party reasonably should know that the evidence may be relevant to anticipated litigation." *World*

25   *Courier v. Barone*, C 06-3072 TEH, 2007 WL 1119196, at *1 (N.D. Cal. Apr. 16, 2007) (quoting

26   *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)).

27        TPI argues that Park had an obligation to preserve data by no later than May 23, 2013

28   when TPI sent Park a letter advising him that it intended to discontinue the severance payments,

United States District Court
Northern District of California

7

1   reminding him of his confidentiality obligations, and stating that "[i]f TPI suspects any further

2   breach of your obligations . . . or inducement of breach by Compugraphics, or any other violations

3   of state and federal law which result in harm to TPI," then TPI would take legal action. *See* Mot. at

4   15; May 23 Letter at 3. TPI also appears to argue that its May 23, 2013 letter to Crownover, which

5   Crownover and Park discussed at some point, should have given rise to Park's duty. *See* Mot. at 6

6   (citing Park Dep. 322:22–323:9). TPI further notes that on July 17, 2013, the day that this

7   litigation commenced, TPI specifically stated in an e-mail to Park that he must not delete any

8   information that might become evidence. *See* Mot. at 15–16; Ochs Decl. Ex. F. Additionally, TPI

9   notes that during the TRO hearing on July 18, 2013, Judge Chesney expressly told Park not to

10   "throw [] away or try to get rid of" anything "important to the case." *See* Mot. at 16; TRO Hr'g Tr.

11   at 17:18–21.

12         Park does not clearly state his position as to when his duty arose. He appears to assert that

13   he did not have any duty until he retained counsel sometime in July 2013. *See* J. Letter at 5 ("Once

14   [Park] did get counsel, and thus had explained to him his legal obligations to preserve evidence, he

15   deleted nothing further."); Ochs Decl. ¶ 8 (declaring that Ochs became aware of Park's retention

16   of counsel on July 24, 2013). Park also notes that the May 23 Letter did not specifically instruct

17   him to seek counsel or save any TPI files. *See* J. Letter at 6.

18         The Court finds that Park's duty arose when litigation was first threatened in the May 23

19   Letter. This letter put Park on notice that he could be sued regarding his employment at

20   Compugraphics. *See* May 23 Letter at 3 ("If TPI suspects any further breach of your obligations

21   by you . . . TPI will take any and all legal action necessary against you and/or Compugraphics

22   . . . ."). At that point, Park should have known that certain evidence in the form of TPI files on his

23   electronic devices "may be relevant to anticipated litigation" regarding his employment at

24   Compugraphics. *See World Courier*, 2007 WL 1119196, at *1 (citation omitted). The Court also

25   notes that before Park received the May 23 Letter, he received a call from a TPI representative

26   reminding him of his continuing post-employment confidentiality obligations. *See* Lopez Decl.

27   ¶ 9. Additionally, around the same time, Park and Crownover had a conversation about TPI's

28   letter to Crownover. *See* Park Dep. 322:22–323:9. Both of these interactions support the

United States District Court
Northern District of California

8

United States District Court
Northern District of California

1   conclusion that it was reasonable for Park to have known that litigation was possible, and that he

2   should preserve potentially relevant evidence.

3          As to the duty's scope, the Court finds that Park was obligated to preserve any files

4   containing TPI information that he had on his electronic devices, because such files would have

5   been "reasonably calculated to lead to the discovery of admissible evidence" and "reasonably

6   likely to be requested during discovery." *See Zubulake IV*, 220 F.R.D. at 217 (quoting *Turner v.*

7   *Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 72 (S.D.N.Y. 1991); *William T. Thompson Co. v.*

8   *General Nutrition Corp.*, 593 F. Supp. 1443, 1455 (C.D. Cal. 1984)). The May 23 Letter

9   specifically stated TPI's position that Park's employment with Compugraphics was not compatible

10  with the confidentiality agreements that he had signed upon termination. *See* May 23 Letter at 1.

11  Thus, Park should have known that any TPI files covered by the confidentiality agreements were

12  potentially relevant. However, Park did not have a duty to preserve *all* of the files on his electronic

13  devices, such as temporary internet files or other files that plainly do not have anything to do with

14  this case. *See Zubulake IV*, 220 F.R.D. at 217 (a party need not preserve "every shred of paper,

15  every e-mail or electronic document").

16                  **2.      Park's state of mind**

17         The Ninth Circuit has recognized "the power of the district court to sanction under its

18  inherent powers not only for bad faith, but also for willfulness or fault by the offending party."

19  *Unigard*, 982 F.2d at 368 n.2. "A party's destruction of evidence qualifies as willful spoliation if

20  the party has some notice that the documents were *potentially* relevant to the litigation before they

21  were destroyed." *Leon*, 464 F.3d at 959 (internal quotation marks and citation omitted) (emphasis

22  in original). "All that the court must find is that [the spoliating party] acted with a 'conscious

23  disregard' of its obligations." *Apple*, 881 F. Supp. 2d at 1147.

24         TPI argues that Park willfully and knowingly destroyed evidence after he knew or should

25  have known that he had a duty to preserve evidence. *See* Mot. at 16. TPI points out that Park

26  admitted at his deposition that it was "[b]ad judgment" to delete TPI files after Judge Chesney's

27  instruction at the TRO hearing. *See id.*; Park Dep. 53:14–18.

28         Park argues that he did not understand his duty to preserve evidence until he retained

1    counsel in July 2013. *See* J. Letter at 5. Park asserts that he "mistakenly concluded that deleting

2    TPI's documents was in accord with" what he understood as his responsibility "not to use or

3    disclose any TPI information." *See* J. Letter at 7. He further asserts that he did not intentionally

4    overwrite any documents, but rather that they were automatically overwritten as a result of Park's

5    regular day-to-day use of his computers. *See id.* at 5.

6         The Court finds that despite Park's apparent confusion about his obligations, Park acted

7    willfully in deleting or overwriting certain files after receiving the May 23 Letter because there is

8    no evidence that he did not receive the letter, or that he did not understand the letter's express

9    threat of a lawsuit. *See Hamilton*, 2005 WL 3481423, at \*5 (negligent destruction of evidence was

10   sufficient to show culpable state of mind for spoliation); *Nucor Corp. v. Bell*, 251 F.R.D. 191,

11   198–99 (D.S.C. 2008) (defendants acted willfully in spoliating evidence on laptops by overwriting

12   files through continued use, even though there was no showing that they had intended to overwrite

13   the files; it was enough that they knew the laptops contained potentially relevant information).

14   Having received the May 23 Letter, Park had notice of what types of files were "potentially

15   relevant"—*i.e.*, any TPI files covered by the confidentiality agreements—and he acted with

16   "conscious disregard" of his duties to preserve this evidence when he deleted files and continued

17   to use his devices in a way that led to the overwriting of files. *See Leon*, 464 F.3d at 959; *Apple*,

18   881 F. Supp. 2d at 1147.

19              **3.      The relevance of destroyed evidence to TPI's case**

20        A finding of spoliation requires a finding that the destroyed evidence was "'relevant' to the

21   party's claim or defense such that a reasonable trier of fact could find that it would support that

22   claim or defense." *Zubulake IV*, 220 F.R.D. at 220.

23        TPI argues that the files deleted and overwritten by Park were relevant to key issues in

24   TPI's trade secret and breach of contract claims. *See* Mot. at 17. Specifically, TPI argues that in

25   order to establish a claim for the misappropriation of trade secrets, TPI must show that Park

26   "improperly acquired and/or used or disclosed its trade secrets." *See id.* (citing Cal. Civ. Code

27   § 3426.1). TPI argues that it "cannot prove that Park acquired the destroyed data from TPI or that

28   the destroyed data contained trade secrets" if that data was destroyed. *See* Mot. at 17. TPI further

United States District Court
Northern District of California

United States District Court
Northern District of California

1    argues that it cannot look for "red flags" as to whether any trade secrets were used or disclosed by

2    Park while at Compugraphics if that data was destroyed. *See id.* A TPI declaration attests to the

3    relevance of thirty-five deleted and recovered documents that contain TPI trade secrets. *See* Kalk

4    Suppl. Decl. ¶¶ 13, 14. TPI argues that the relevance of these recovered documents gives rise to

5    the inference that many of the other deleted and overwritten documents were also relevant. *See*

6    Mot. at 16–17.

7         Park does not argue that all of the deleted and overwritten TPI files were irrelevant to

8    TPI's case, but rather he argues generally that he never intended to and did not use or share the

9    files. *See* J. Letter at 6. As to non-TPI files such as computer-created system files, Park argues that

10   such files are plainly irrelevant. *See id.*

11        The Court agrees with TPI that the contents of certain deleted and overwritten files are

12   relevant to TPI's case. However, it is apparent that only a subset of the total number of deleted or

13   overwritten files are relevant.

14        First, only a fraction of the 241,015 deleted or overwritten files are user files. *See* Magley

15   Decl. ¶ 8. According to the declaration of Advanced Discovery's Aaron Magley ("Magley"), user

16   files are typically word processer files, e-mails, spreadsheets, presentations, and so forth. *See id.*

17   ¶ 8 n.1. This is in contrast to system files, which may be computer-created and are unlikely to

18   contain user data. *See id.* Although there is some confusion as to how many of the deleted and

19   overwritten files are user files, it appears that there are between 816 and 1,650 user files.[4] TPI does

20   not present a meaningful argument that any of the non-user files are relevant. Accordingly, TPI

21   has shown that between 816 and 1,650 files have more than a trivial possibility of being relevant.

22        Second, it appears that only a portion of the 816 to 1,650 user files were deleted after

23   Park's duty arose on May 23, 2013. Magley's declaration cites generally to the deleted file log

24   exhibits, which list files deleted or overwritten both before and after May 23, 2013. *See id.* Exs.

25

26   [4] Magley declares that 241,015 files, including 816 user files, were deleted before Advanced
     Discovery received the devices on August 20, 2013, with no beginning date specified. *See* Magley
27   Decl. ¶ 8. However, the total number of deleted files calculated by totaling Magley's device-by-
     device narratives in his declarations, which cover five of the twelve devices, is 1,650 user files.
28   *See id.*

1   A–E. However, these file logs total over 6,700 pages, are not sorted in any obvious way, and do

2   not distinguish between user files and computer-created or system files. *See id.* The Court declines

3   to peruse the file logs itself and tally the number of user files that were deleted or overwritten after

4   Park's duty arose and, as a result, it is not clear on this record how many files actually fall into this

5   category.[5] Nonetheless, the Court finds that TPI has presented sufficient evidence to give rise to an

6   inference that a substantial number of the deleted or overwritten files were relevant and deleted or

7   overwritten after his duty arose.[6]

8          **B.**     **Adverse Inference Sanctions**

9        Having found that some spoliation has occurred, the Court turns to the question of what

10  sanctions, if any, are appropriate. Park is correct that the Court should consider the *Schmid* factors

11  in making this determination. *See* J. Letter at 6. These factors are: (1) the degree of fault of the

12  party who destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and

13  (3) whether a lesser sanction would avoid substantial unfairness to the opposing party. *Nursing*

14  *Home Pension Fund*, 254 F.R.D. at 563 (quoting *Schmid*, 13 F.3d at 79).

15       TPI seeks sanctions in the form of the following adverse inferences:

16          If Park had preserved and produced the deleted and destroyed data it
    would have shown that (1) Park acquired some or all of the data

17          from TPI ("TPI data"); (2) Park failed to satisfy his duty to return to
    TPI the data he acquired; (3) some or all of the TPI data he acquired

18          was confidential; (4) some or all of the TPI data he acquired
    constituted and/or contained TPI trade secrets; (5) Park used TPI's

19          trade secrets in his work at Compugraphics; and (6) TPI was
    prejudiced by Park's conduct.

20

21

22

---

23  [5] For example, the Court notes that although Franklin Kalk's declaration describes thirty-five
    deleted and recovered documents as relevant, it is not clear whether these documents were deleted

24  before or after Park's duty arose. *See* Kalk Suppl. Decl. ¶¶ 8–13.

25  [6] The Court notes that TPI specifically identified by filename eight documents that were deleted or
    overwritten after Park's duty arose: (1) "Qz etch tracking," (2) "toppan_lam," (3) "PHOLO," and

26  (4) "Grating_1492275_return," all overwritten from the Dell Inspiron laptop between May 26 and
    May 31, 2013; (5) "dry etch process plan," and (6) "dry etch plan," both overwritten from the

27  SanDisk USB device between July 3 and July 14, 2013; (7)–(8) two files with "quartz etch" in the
    filename, both deleted from the Seagate hard drive on July 17, 2013. *See* Mot. at 9; Magley Decl.

28  ¶¶ 9, 10, 11.

United States District Court
Northern District of California

1    J. Letter at 1. For the reasons explained below, the record is not sufficiently developed to justify

2    the granting of these adverse inference sanctions.

### 1.    Degree of Park's Fault

4    "A party's destruction of evidence need not be in 'bad faith' to warrant a court's

5    imposition of sanctions." *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1066 (N.D.

6    Cal. 2006) (quoting *Glover*, 6 F.3d at 1329; *Unigard*, 982 F.2d at 368 n.2). "However, a party's

7    motive or degree of fault in destroying evidence is relevant to what sanction, if any, is imposed."

8    *Id.* at 1066–67 (citations omitted).

9    A spoliator's degree of fault may vary depending on the moment of inquiry. In this case,

10   Park's degree of fault for deleting or overwriting documents at the inception of his duty on May

11   23, 2013 was not particularly high because he was pro se and apparently confused about his duty

12   to preserve evidence. *See Keithley v. Homestore.com, Inc.*, C-03-04447 SI (EDL), 2008 WL

13   4830752, at *3 (N.D. Cal. Nov. 6, 2008) (pro se status is "perhaps a mitigating factor in terms of

14   the severity of sanctions"). Park's argument appears to be consistent with the record. *See* J. Letter

15   at 6. For example, the fact that Park sporadically deleted documents after his departure from TPI,

16   well before any lawsuit was on the horizon, supports his argument that he had not intended to use

17   the TPI files that he had kept. *See* J. Letter at 5; Park Dep. at 48:17–20 (Park testifying that

18   between January and July, he continuously deleted TPI files).[7] Further, as to the two e-mailed

19   documents that sparked this lawsuit, Park asserts that he had e-mailed these files to himself in

20   order to prepare for a training he was going to conduct on his last day, and that a trainee engineer

21   recalls being trained on the contents of these documents. *See* J. Letter at 5. *See also* Park Dep. at

22   82:8–83:20. TPI has not denied that this training occurred.

23   However, Park's degree of fault increased when he continued to delete and overwrite

24   documents after receiving Ochs' July 17, 2013 e-mail, which informed him that the underlying

25

26   [7] The Court also notes that Park testified that while employed at TPI, he was permitted access to
27   the TPI network from his personal computer at home, and this privilege was revoked upon his
     termination. *See* Park Dep. at 39:18–25. Such access is inconsistent with TPI's assertions that Park
28   did not or was not authorized to work at home. *See* Kalk Decl. ¶ 10; Lopez Decl. ¶ 5.

13

United States District Court
Northern District of California

1    complaint had been filed, and which contained express instructions to refrain from deleting

2    evidence. *See* Ochs Decl. ¶ 5, Ex. F ("[Y]ou are required to preserve all evidence in this case.

3    Your deletion or destruction of any information, whether a device, or in hard copy or electronic

4    form, will constitute spoliation of evidence and will result in further claims against you."). There

5    is no evidence that he did not receive or understand this clear admonition. And even though he

6    was pro se until approximately July 24, 2013, he was still "expected to abide by the rules of the

7    court in which he litigates," and this included fulfilling his duty not to spoliate evidence. *See*

8    *Carter v. CIR*, 784 F.2d 1006, 1008 (9th Cir. 1986).

9           Park's degree of fault increased further still to the level of bad faith when he continued to

10   delete and overwrite documents after Judge Chesney ordered him to refrain from deleting

11   evidence at the July 18, 2013 TRO hearing. *See* TRO Hr'g Tr. at 17:18–21 ("Sir, if you do have

12   anything that's important to the case . . . don't throw it away or try to get rid of it, or you might be

13   exposed to some other type of complaint."). Park testified that he understood Judge Chesney's

14   statements as an order to refrain from deleting files from his Dell Inspiron laptop. *See* Park Dep. at

15   52:17–53:2. Additionally, the TRO, which was issued on the same day, gave Park notice that any

16   TPI files in his possession were TPI's property and they needed to be returned. *See* TRO ¶¶ 2(b)

17   ("Defendant is enjoined from possessing . . . any of TPI's confidential information . . . ."), 2(c)

18   ("Defendant is required to account . . . for and return to TPI any and all of TPI's property,

19   including its Trade Secrets obtained by Defendant from TPI").

20          Finally, the Court notes that Park and his counsel appear to have caused delays in turning

21   over all of the devices to Advanced Discovery for inspection. *See* Mot. at 11; Ochs Decl. Exs. I–L.

22          Although Park's degree of fault was not high at the inception of his duty, his degree of

23   fault increased when he continued to destroy evidence after receiving Ochs' July 17, 2013 e-mail,

24   and increased further still to the level of bad faith when he continued to destroy evidence after

25   Judge Chesney's order at the July 18, 2013 TRO hearing. Thus, this factor weighs in favor of

26   granting sanctions in the form of adverse inferences.

27                    **2.      Degree of prejudice to TPI**

28          As to prejudice, the inquiry "looks to whether the spoiling party's actions impaired the

United States District Court
Northern District of California

14

United States District Court
Northern District of California

1    non-spoiling party's ability to go to trial or threatened to interfere with the rightful decision of the

2    case." *Leon*, 464 F.3d at 959 (internal quotation marks and alterations omitted). To show

3    prejudice, the moving party "usually sets forth some type of extrinsic evidence as to the content of

4    the missing materials which demonstrates the extent to which such materials would have been

5    harmful to the spoliator. This corroboration is especially important where the destruction is merely

6    negligent since there is no bad faith in such cases from which to infer the evidence would have

7    been detrimental to the spoliator." *Hamilton*, 2005 WL 3481423, at *8 (quoting *Skeete v.*

8    *McKinsey & Co., Inc.*, No. 91 Civ. 8093 (PKL), 1993 WL 256659, at *7 (S.D.N.Y. 1993)).

9            Where a non-spoliating party has other evidence to prove its case, the degree of prejudice

10   is lower, and a court may decline to impose adverse inference sanctions. *See, e.g.*, *Nursing Home*

11   *Pension Fund*, 254 F.R.D. at 564 ("plaintiffs have not demonstrated the degree of prejudice

12   necessary to warrant terminating sanctions . . . primarily because plaintiffs have received a large

13   quantity of materials through the discovery process"); *In re Napster*, 462 F. Supp. 2d at 1077

14   (although finding spoliation, refraining from imposing default sanctions because, "[a]t this stage

15   of the proceedings, when the full evidentiary record has not yet been considered by the court or by

16   a jury, the court cannot determine the extent of prejudice created by [spoliator's] failure to

17   preserve its emails."); *Ahcom, Ltd. v. Smeding*, No. 07-1139 SC, 2011 WL 3443499, at *8–*9

18   (N.D. Cal. Aug. 8, 2011) (concluding that both terminating and adverse inference sanctions were

19   inappropriate where destruction of computer that contained defendant's financial information was

20   "highly unlikely" to have materially affected the outcome of the case—namely, the alter ego

21   determination—because plaintiff had "extensive information" as to defendant's finances);

22   *Hamilton*, 2005 WL 3481423, at *8 (denying sanctions for negligent destruction of part of

23   surveillance video for lack of prejudice because plaintiffs failed to provide extrinsic evidence that

24   remaining portion of video was inaccurate and because plaintiffs had other evidence available); *In*

25   *re Hitachi Television Optical Block Cases*, 08CV1746 DMS NLS, 2011 WL 3563781, at *11

26   (S.D. Cal. Aug. 12, 2011) (although finding spoliation, declining to impose adverse inference

27   sanctions because there was "no evidence that would lead the Court to conclude [the] spoliation

28   has impaired Plaintiffs' ability to go to trial, threatened to interfere with the rightful decision of the

15

1    case, or forced Plaintiffs to rely on incomplete and spotty evidence").

2         Here, TPI argues that it is disadvantaged because it does not have all of the contents of the

3    TPI files that Park deleted from his devices. *See* Mot. at 16–17; J. Letter at 3–4. Specifically, TPI

4    argues that without the deleted and overwritten files, "it is more difficult . . . to show not only that

5    Park acquired certain specific trade secrets and confidential documents which he failed to return,

6    but also the extent to which he may have used those documents in connection with the work he

7    was performing for his subsequent employer, Compugraphics." *See* Mot. at 13 (citing Kalk Suppl.

8    Decl. ¶ 4). TPI explains that "[w]ithout access to the contents of the documents he deleted, it

9    would be impossible or very difficult and expensive to determine whether the information

10   contained in those documents was utilized on the Compugraphics tools." *See* Mot. at 13 (citing

11   Kalk Suppl. Decl. ¶ 5). Further, TPI argues that it "cannot determine the general risk it faces from

12   Park's possession of certain trade secrets without having access to the information contained in

13   those trade secret documents." *See* Mot. at 13–14 (citing Kalk Suppl. Decl. ¶ 6). Park argues that

14   this issue cannot be decided on the present record. *See* J. Letter at 7–8.

15        The Court generally agrees with Park. TPI has not shown evidentiary prejudice that would

16   justify its proposed adverse inferences. Many of the deleted files have already been recovered,

17   which means that TPI has some evidence to prove its case. *See Ahcom*, 2011 WL 3443499, at *8–

18   *9; *Hamilton*, 2005 WL 3481423, at *8. Further, the parties have not yet attempted carving, which

19   may recover some or all of the overwritten files and which will likely result in more evidence to

20   prove TPI's case. *See In re Napster*, 462 F. Supp. 2d at 1077.

21        Thus, this factor weighs against granting adverse inferences at this time.

22              **3.      Suitability of lesser sanctions**

23        Rejection of lesser sanctions is appropriate if (1) no lesser sanction could both punish the

24   spoliator and deter others similarly tempted, and (2) the facts show that deceptive conduct has

25   occurred and will continue. *Io Grp.*, 2011 WL 4974337, at *8 (citing *Advantacare Health*

26   *Partners, LP v. Access IV*, No. 03-4496, 2004 WL 1837997, at *6 (N.D. Cal. Aug. 17, 2004)). An

27   adverse inference sanction is an "extreme sanction" that "should not be given lightly." *See*

28   *Zubulake IV*, 220 F.R.D. at 219.

United States District Court
Northern District of California

1      Here, the Court finds that the adverse inferences sought by TPI are not warranted. TPI has

2  shown the spoliation of fewer than 1,650 files out of the 240,000 files that it asserts were

3  destroyed, many of which have been fully restored. The remaining overwritten files may yet be

4  restored by carving. TPI has not shown a likelihood that there is risk of erroneous judgment in the

5  absence of sanctions. Additionally, Park does not appear poised to continue deleting evidence.

6      Accordingly, the Court's intervention through adverse inference sanctions would be

7  inconsistent with the purposes of sanctions. *See Apple*, 881 F. Supp. 2d at 1136 (citations and

8  internal quotation marks omitted) ("Any remedy applied to a spoliator should be designed to: (1)

9  deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party

10  who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would

11  have been absent the wrongful destruction of evidence by the opposing party.").

12      Thus, this factor weighs in favor of the imposition of lesser sanctions than those requested

13  by TPI.

### 4.      Summary of adverse inference analysis

15      The Court has considered Park's degree of fault, and finds that though it was not

16  particularly high at the inception of his duty on May 23, 2013, it increased after Ochs' July 17,

17  2013 e-mail, and increased further still to the level of bad faith after Judge Chesney's July 18,

18  2013 order during the TRO hearing. The Court has considered TPI's degree of prejudice, and it

19  finds that on the current record, there is no evidentiary prejudice as to the deleted files, and it is

20  not yet possible to determine the degree of evidentiary prejudice as to the overwritten files. The

21  Court finds that in light of this incomplete showing of prejudice, the adverse inferences sought by

22  TPI are not appropriate. Accordingly, although the Court finds that some spoliation has occurred,

23  it declines to impose any adverse inference sanctions.

### C.      Monetary Sanctions

25      Pursuant to its inherent powers, a district court may award monetary sanctions in the form

26  of attorney's fees against a party or counsel who acts "in bad faith, vexatiously, wantonly, or for

27  oppressive reasons." *Leon*, 464 F.3d at 961 (quoting *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115

28  F.3d 644, 648 (9th Cir. 1997)). Before awarding monetary sanctions pursuant to its inherent

United States District Court
Northern District of California

17

1    powers, "the court must make an express finding that the sanctioned party's behavior 'constituted

2    or was tantamount to bad faith.'" *Leon*, 464 F.3d at 961 (citing *Primus Auto.*, 115 F.3d at 648). A

3    party "demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of

4    a court order." *Leon*, 464 F.3d at 961 (citing *Primus Auto.*, 115 F.3d at 648). The amount of the

5    sanction must be "reasonable." *Leon*, 464 F.3d at 961 (quoting *Brown v. Baden (In re Yagman)*,

6    796 F.2d 1165, 1184 (9th Cir. 1986), *as amended by* 803 F.2d 1085 (9th Cir. 1986)).

7            Here, TPI argues that it has incurred monetary costs in the form of recovering the deleted

8    files and attorney's fees in bringing this motion. *See* Mot. at 19. The Court agrees that TPI has

9    incurred costs associated with the spoliation. The Court also finds that Park has acted willfully and

10   with varying degrees of fault, including bad faith, after Park continued to delete or overwrite files

11   after Judge Chesney's July 18, 2013 order during the TRO hearing. *See* Parts IV.A.2., IV.B.1.,

12   *supra*. Thus, the Court finds that it is proper to impose monetary sanctions pursuant to its inherent

13   powers.

14           Separately, a court may also issue monetary sanctions for "fail[ing] to obey an order to

15   provide or permit discovery." Fed. R. Civ. P. 37(b)(2). Specifically, a court may "order the

16   disobedient party, the attorney advising that party, or both to pay the reasonable expenses,

17   including attorney's fees, caused by the failure, unless the failure was substantially justified or

18   other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C). A finding of

19   bad faith is not required for monetary sanctions under Rule 37. *Dong Ah Tire & Rubber Co., Ltd.*

20   *v. Glasforms, Inc.*, C 06-3359 JF (RS), 2009 WL 1949124, at *4 (N.D. Cal. July 2, 2009)

21   *modified*, C 06-3359 JF (RS), 2009 WL 2485556 (N.D. Cal. Aug. 12, 2009) (citing *Hyde & Drath*

22   *v. Baker*, 24 F.3d 1162, 1171 (9th Cir. 1994)).

23           Here, the Court finds that Park violated Judge Chesney's July 18, 2013 order to preserve

24   evidence, and the TRO itself, when he deleted or overwrote TPI files after those court orders were

25   given. *See* TRO Hr'g Tr. at 17:18–21; TRO ¶¶ 2(b), 2(c); Park Dep. at 53:14–22 (admitting that he

26   deleted TPI files after Judge Chesney's order during hearing on July 18, 2013). Although it is not

27   clear on this record exactly how many relevant files were wrongfully deleted after the TRO and

28   Judge Chesney's order, *see* Part IV.A.3, *supra*, the parties do not appear to dispute that Park

United States District Court
Northern District of California

18

1    deleted or overwrote some number of files after these court orders were issued. Additionally, TPI

2    submitted copies of e-mail correspondence between TPI and Park's counsel in the days leading up

3    to Park's production of his electronic devices, which suggest that Park delayed timely turning over

4    all of his electronic devices to Advanced Discovery and, as a result, may have violated the TRO in

5    that way. *See* Ochs Decl. Exs. I–N; TRO ¶ 2(c). Thus, the Court finds that it is proper to impose

6    monetary sanctions under Rule 37.

7    　　　The Court also notes there is no question that Park's deletion of documents gave rise to the

8    Advanced Discovery fees and prompted the instant Motion. Courts considering similar

9    circumstances have found it appropriate to award expenses. *See, e.g.*, *In re Napster*, 462 F. Supp.

10   2d at 1078 (observing that "[m]onetary sanctions may be imposed where one party has wrongfully

11   destroyed evidence" and imposing reasonable attorney's fees associated with bringing motion for

12   sanctions) (citing *Nat'l Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 558 (N.D. Cal.

13   1987)); *Zubulake IV*, 220 F.R.D. at 222 ("Even though an adverse inference instruction is not

14   warranted, there is no question that e-mails that UBS should have produced to Zubulake were

15   destroyed by UBS. That being so, UBS must bear Zubulake's costs for re-deposing certain

16   witnesses for the limited purpose of inquiring into issues raised by the destruction of evidence . . .

17   ."); *Net-Com Servs., Inc. v. Eupen Cable USA, Inc.*, CV 11-2553 JGB SSX, 2013 WL 4007785, at

18   *3 (C.D. Cal. Aug. 5, 2013) ("While it is not yet clear whether or to what degree [defendant] has

19   been prejudiced, the Court finds it appropriate for [plaintiff], due to [its] negligence, to bear the

20   full cost of restoring and producing data on the hard drives submitted to [forensics expert].").

21   　　　Accordingly, the Court imposes the following monetary sanctions pursuant to its inherent

22   powers and, alternatively, pursuant to Rule 37(b)(2)(C): (1) Park shall pay the costs of Advanced

23   Discovery fees incurred to date; (2) Park shall pay the costs of carving all overwritten user files

24   that were deleted or overwritten after his duty to preserve evidence arose on May 23, 2013; and (3)

25   after further briefing, Park shall pay reasonable attorney's fees and costs associated with this

26   Motion, including the fees and costs associated with the further briefing. The parties shall meet

27   and confer regarding a briefing schedule, which shall require TPI to submit an opening brief and

28   documentation of its attorney's fees and costs in the form of time sheets or similar records. Park

United States District Court
Northern District of California

19

1   shall submit an opposition within one week of the opening brief, and TPI shall submit a reply

2   within one week of the opposition. Briefs shall not exceed ten pages, excluding exhibits. The

3   parties shall file a stipulation with the briefing schedule within fourteen days of the date of this

4   Order.

5   **V.      CONCLUSION**

6          For the foregoing reasons, the Motion is DENIED as to adverse inference sanctions, and it

7   is GRANTED IN PART as to monetary sanctions, as described above.

8          **IT IS SO ORDERED.**

9   Dated: May 29, 2014

10   _____

11   JOSEPH C. SPERO
     United States Magistrate Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28